**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Dr. Peter A. Eriksson,

Plaintiff,

Civ. No. 13-647 (RHK/LIB)
**MEMORANDUM OPINION AND ORDER**

v.

Deer River Healthcare Center, Inc.,

Defendant.

---

Kelly A. Jeanetta, Kelly A. Jeanetta Law Firm, LLC, Minneapolis, Minnesota, for Plaintiff.

Joseph J. Mihalek, Fryberger Buchanan Smith & Frederick, PA, Duluth, Minnesota, for Defendant.

---

## INTRODUCTION

Plaintiff Dr. Peter Eriksson previously worked for Defendant Deer River Healthcare Center, Inc. ("DRHC") as a family-practice physician. He commenced this action in March 2013, alleging that DRHC terminated his employment in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. Presently before the Court is DRHC's Motion for Summary Judgment. For the reasons that follow, the Court will grant the Motion.

## BACKGROUND

The pertinent facts are undisputed. At all relevant times, DRHC operated a hospital in Deer River, Minnesota, and a clinic (known as the Meridian Clinic) in Grand

Rapids, Minnesota, approximately 15 miles away. (Stampohar Dep. at 9, 11.) Pursuant to an employment agreement dated March 27, 2008, DRHC hired Dr. Eriksson as a family-practice physician working "a minimum of two (2) days per week, each of which . . . shall consist of at least ten (10) hours . . . provid[ing] medical services to . . . patients" at the Meridian Clinic. (Eriksson Dep. Ex. 1.) The agreement further specified that Dr. Eriksson was an at-will employee whose employment could be terminated for any reason with 90 days' notice. (Id.)

In 2011, Dr. Eriksson began to fall behind on his patient charting, which DRHC mandated to be completed within 14 days. (Eriksson Dep. at 73 & Ex. 19.) The Meridian Clinic's manager, Nancy Buescher, met with him several times over the ensuing 18 months to discuss the problem. (Id. at 76.) Buescher advised that delayed charting could render DRHC unable to bill for his services, and in fact it had written off thousands of dollars in treatments Dr. Eriksson provided to patients due to his dilatoriness. (Id. at 78, 114-15 & Ex. 16.) Similar concerns were expressed by employees of DRHC's hospital, who also complained about untimely charting for patients Dr. Eriksson had treated in the emergency room (ER). (Id. at 69-71.)

Besides untimely documentation, DRHC harbored other concerns with Dr. Eriksson's performance. For example, he frequently opted to work more lucrative shifts in the hospital ER rather than seeing patients at the Meridian Clinic, finding others to cover his clinic shifts (including after-hours urgent care). (Id. at 89-90, 101-04.) This caused difficulties for clinic staff, as they were not always aware whether Dr. Eriksson (or some other provider) was seeing patients; he often informed staff about the changes

only at the last minute. (Id. at 101-02 & Exs. 10, 20, 29.) These communication and scheduling concerns were discussed at an April 2012 meeting between Dr. Eriksson, Buescher, and Jeff Stampohar, DRHC's CEO. (Id. Ex. 10.) Further, the number of patients who listed Dr. Eriksson as their primary-care provider – his so-called "patient panel" – was essentially flat over the course of his employment. (Stampohar Dep. at 81-82, 115 & Ex. 39; Buescher Dep. at 28, 68-69; Stampohar Aff. ¶ 10.) Other healthcare providers at the Meridian Clinic were able to grow their practices during Dr. Eriksson's tenure, but he did not. (Stampohar Dep. Ex. 39; Stampohar Aff. ¶¶ 7, 9.)[1] Buescher attributed this failure to a lack of engagement, including his desire to work in the ER and opting out of urgent care (where new patients are often found), as well as his communication difficulties, which included some patient complaints about his bedside manner and attentiveness. (Buescher Dep. at 28.) Moreover, several of Dr. Eriksson's peers expressed concerns about his clinical skills, specifically his ability to properly intubate patients.[2] (Eriksson Dep. Exs. 12-14, 29, 31-32.) All of these concerns were relayed to Stampohar. (Id. Exs. 10, 12, 15, 16-18, 20-30.)

On June 7, 2012, Dr. Eriksson applied for intermittent FMLA leave in order to care for his wife, who had been diagnosed with breast cancer. (Eriksson Dep. Ex. 35.) His application was approved, and he took off several work days over the ensuing months

[1] Although DRHC did not set a formal goal for panel growth, Buescher communicated to Dr. Eriksson DRHC's expectation that his panel would expand over time. (Buescher Dep. at 69.)

[2] Intubation involves placing a tube into the trachea (windpipe) to aid with breathing or mechanical ventilation.

to assist with his wife's care and treatment. (Eriksson Dep. at 64.) He acknowledges that he was never denied time off from work to aid his wife. (Id.)

In the meantime, however, his charting had become seriously delinquent. DRHC informed him by e-mail in April 2012 that he had 180 documents that required electronic signatures. (Id. Ex. 9.) Although he endeavored to catch up, he remained well behind into the summer of 2012. On June 12, 2012, Buescher e-mailed him to remind him that he needed to "finish [his] charts ASAP" because the corresponding patient visits could not "be billed out until documentation is completed." (Id. Ex. 16.) She also noted that DRHC had been required to write off several patient visits because of his delayed documentation. (Id.) She advised that he needed to complete his documentation by June 15, 2012, else DRHC would "begin suspension of [his] privileges" – meaning he would be unable to work – "until documentation is complete." (Id.) A similar warning was communicated by letter on June 18, 2012. (See id. Ex. 33.)

Despite these warnings, Dr. Eriksson did not bring his documentation current. On June 25, 2012, DRHC hand-delivered him a letter informing him that he "continue[d] to be out of compliance with [his] documentation" and, as a result, his privileges would be suspended on June 27, 2012 (meaning he could not work in the ER or at the Meridian Clinic). (Id. Exs. 18-19.) Though he attempted to rapidly catch up, he had not done so by June 27, and DRHC then opted to "proceed with the suspension." (Id. Ex. 21.) But before he could actually be suspended, Dr. Eriksson finally completed his required documentation. (Eriksson Dep. at 118 & Ex. 25.)

A short time later, DRHC scheduled a meeting with Dr. Eriksson to discuss his dilatoriness and to implement a plan to ensure he did not become delinquent in the future. (Id. Exs. 25-28.) In advance of that meeting, it drafted a written "Performance Improvement Plan" warning of possible disciplinary action for further non-compliance with its charting policies.[3] (Id. Exs. 11, 28.) DRHC presented the Plan to Dr. Eriksson at a meeting on July 2, 2012, and he signed it on July 12, 2012.[4] (Id. Ex. 11.)

Nevertheless, by late July 2012, Stampohar had concluded Dr. Eriksson was not a "good fit" for the organization. (Stampohar Dep. at 52-54.) By letter dated July 27, 2012, he invoked the 90-day termination clause in Dr. Eriksson's employment agreement, ending his employment effective October 26, 2012; the letter did not offer any explanation for the termination. (Eriksson Dep. Ex. 4.) After receiving the letter, Dr. Eriksson contacted Stampohar and asked him to reconsider and give him "another chance." (Eriksson Dep. at 81.) He did not mention his wife's health or his FMLA leave at that time. (Stampohar Dep. at 121.) Stampohar refused, explaining in a subsequent letter that (1) his practice "at the Meridian Clinic . . . has not thrived as we hoped it would," (2) he had not grown his patient panel, and (3) he had "shown much more interest in working at the emergency room than . . . in the Meridian Clinic," and as a

[3] The initial draft of the Plan warned of the possibility of termination for future noncompliance, but Buescher requested this language be removed because the July 2 meeting would be "the first time we sat down with Dr. Eriksson to address this." (Eriksson Dep. Ex. 28.) It is unclear what she meant by this statement, however, as she testified in her deposition that she had regular meetings with Dr. Eriksson to discuss his untimeliness. Dr. Eriksson, too, acknowledged in his deposition that he had "regular" conversations with Buescher throughout 2011 and 2012 to address his charting deficiencies. (Eriksson Dep. at 73-77.)

[4] According to Dr. Eriksson, he remained compliant with the Plan's goals thereafter, but the record indicates that he once again fell behind in his charting. (See Eriksson Dep. Ex. 30.)

result, Stampohar continued to "believe [he was] not a good fit" for DRHC. (Eriksson Dep. Ex. 5.) Further overtures by Dr. Eriksson to remain employed were rebuffed (see id. Exs. 6-8), and his employment terminated in October 2012.

On March 21, 2013, Dr. Eriksson commenced the instant action against DRHC, alleging it had terminated his employment in retaliation for exercising his FMLA rights. With discovery now complete, DRHC moves for summary judgment. Its Motion has been fully briefed and is ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*);[5] Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a

[5] Several Eighth Circuit cases cited herein have a "red flag" on Westlaw as a result of Torgerson, which abrogated a litany of decisions suggesting summary judgment should be granted sparingly in discrimination cases. Because this Court has cited these cases for different legal principles that remain good law, it has not indicated such abrogation.

genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

### I. The FMLA generally and Dr. Eriksson's claim

Congress enacted the FMLA to "balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1). It entitles an employee, during any 12-month period, to take 12 weeks of unpaid leave for medical reasons or to care for family members with serious health conditions. § 2612(a)(1).[6] The Act renders it unlawful for an employer to "interfere with, restrain, or deny the exercise of . . . any right provided" thereunder or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by its terms. § 2615(a)(1)-(2).

The Eighth Circuit has clarified that three types of claims exist under the FMLA: entitlement, retaliation, and discrimination. See, e.g., Bosley v. Cargill Meat Solutions Corp., 705 F.3d 777, 780 (8th Cir. 2013). In an "entitlement" claim, the "employee claims the denial of a benefit to which he is entitled under the statute," id., that is, claims his employer "refuse[d] to authorize leave under the FMLA" or took "other action to avoid responsibilities under the Act," Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012). In a "retaliation" claim, an employee asserts that his employer took adverse action against him for "oppos[ing] any practice made unlawful

[6] The statute applies only if (1) the plaintiff has been employed "for at least 1,250 hours of service with [his] employer during the previous 12-month period" and (2) the employer has at least 50 employees within 75 miles of the plaintiff's worksite. 29 U.S.C. § 2611(2)(A)-(B). DRHC does not dispute these conditions are satisfied here.

under the FMLA." Id. at 1005-06. Finally, in a "discrimination" claim, an employee asserts that his employer took "adverse action against [him] because [he] exercise[d] rights to which he is entitled under the FMLA." Id. In this scenario, "the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment." Id.

Here, Dr. Eriksson has labeled his claim as one for "retaliation" (see Compl. at 3; Mem. in Opp'n at 17), but in actuality he asserts a "discrimination" claim. It is undisputed DRHC did not "prevent [him] from receiving FMLA benefits." Pulczinski, 691 F.3d at 1006. Nor does he allege that he suffered adverse action for "oppos[ing] any practice made unlawful under the FMLA." Id. at 1005-06. Rather, he claims DRHC terminated his employment because he exercised his right to FMLA leave. (See Mem. in Opp'n at 18-26.) This is a "discrimination" claim and will be analyzed accordingly. See Walker v. Trinity Marine Prods., Inc., 721 F.3d 542, 545 (8th Cir. 2013); Pulczinski, 691 F.3d at 1006.[7]

## II. Dr. Eriksson's claim fails

### A. The prima facie case

To establish discrimination under the FMLA, a plaintiff must proffer "proof of the employer's discriminatory intent," which "may come from direct evidence or [from] indirect evidence using the McDonnell Douglas burden-shifting framework." Brown v.

[7] In any event, for the reasons set forth below, the claim would fail even if viewed as a "retaliation" claim. See Brown v. City of Jacksonville, 711 F.3d 883, 891 (8th Cir. 2013) (recognizing similar analysis applies to "discrimination" and "retaliation" claims).

City of Jacksonville, 711 F.3d 883, 891 (8th Cir. 2013) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-06 (1973)). As Dr. Eriksson offers no "direct evidence" here, his claim must be analyzed under McDonnell Douglas, which requires him to first establish a prima facie case by showing (1) he engaged in activity protected under the FMLA, (2) he suffered a materially adverse employment action, and (3) a causal connection links the two. Pulczinski, 691 F.3d at 1007. DRHC does not dispute Dr. Eriksson has established the first two elements of his prima facie case (he requested FMLA leave and his employment was terminated), but it contends he has failed to satisfy the third element because he cannot show a causal connection between them. (Def. Mem. at 12-17.) The Court agrees.

The primary evidence proffered by Dr. Eriksson to show a causal nexus is timing. He contends the 50-day period between seeking FMLA leave on June 7, 2012, and DRHC's termination of his employment on July 27, 2012, is sufficient to show causation. (Mem. in Opp'n at 19-20.) But while the burden of establishing a prime facie case is low, generally speaking temporal proximity is not enough to satisfy it. See, e.g., Wallace v. Sparks Health Sys., 415 F.3d 853, 859 (8th Cir. 2005) ("[M]ore than temporal proximity is needed to show a causal link" for the prima facie case.); Eliserio v. United Steelworkers of Am. Local 310, 398 F.3d 1071, 1079 (8th Cir. 2005) (while timing may establish causation in limited circumstances, "[g]enerally . . . a temporal connection alone is not sufficient"). Only where protected conduct and adverse action are "very close" will temporal proximity establish the causal link necessary for a prima facie case. E.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (*per curiam*) ("The cases

that accept mere temporal proximity between . . . protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close."); accord, e.g., Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 986 (8th Cir. 2011) (inference of causation "vanishes . . . when the time gap between the protected activity and the adverse employment action is measured in months"); Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1087-88 (8th Cir. 2010) (one-month gap insufficient); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) (two-week interval was "sufficient, but barely so"); Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (two-month interval failed to establish a causal connection). The nearly two-month gap here is simply too wide to establish the third element of Dr. Eriksson's prima facie case.[8]

Dr. Eriksson attempts to avoid this problem by shortening the gap, arguing the Court should calculate the relevant time period not from the date he *applied* for FMLA leave (June 7), but rather from the days he actually *took* leave. Indeed, he notes that his employment was terminated on July 27, 2012, a day he was out of work on FMLA leave. (Mem. in Opp'n at 20.) But as DRHC correctly notes, Stampohar made the decision to terminate Dr. Eriksson's employment, and though the record shows he was aware Dr. Eriksson had *applied* for FMLA leave, it is undisputed he did *not* know when Dr.

[8] To be sure, some older Eighth Circuit cases, including those cited by Dr. Eriksson, suggested a gap as long as six months might suffice. See, e.g., Mathews v. Trilogy Commc'ns, Inc., 143 F.3d 1160, 1166 (8th Cir. 1998) ("[A] time lapse of only two months between the exercise of protected rights and a discharge may create the inference of a retaliatory motive."); Smith v. St. Louis Univ., 109 F.3d 1261, 1266 (8th Cir. 1997) (inference of causal connection found despite six-month gap between adverse action and protected activity); O'Bryan v. KTIV Television, 64 F.3d 1188, 1193-94 (8th Cir. 1995) (three-month gap sufficient). Post-Breeden cases, however, have retreated from that notion.

Eriksson actually *used* it. (Stampohar Dep. at 78, 80, 121.) The relevant time period, therefore, must be measured from the date Dr. Eriksson first sought leave, the only protected conduct of which Stampohar was aware. See, e.g., Breeden, 532 U.S. at 273 (date plaintiff received right-to-sue letter was irrelevant when calculating temporal proximity, as decisionmaker was unaware of it when deciding to transfer her).

Dr. Eriksson also argues DRHC took "escalating adverse and retaliatory action" after he applied for FMLA leave, and this "extra quantum of evidence," when combined with timing, establishes a causal link. (Mem. in Opp'n at 20-22.) He notes that although "there had been occasions during the 18 months prior to his termination that he had to be reminded . . . to get his charting done, [DRHC] had not, before Dr. Eriksson went on leave, seen fit to document its concerns." (Id. at 21.)

True, only after Dr. Eriksson requested FMLA leave did DRHC threaten suspension, issue the Performance Improvement Plan, and then terminate his employment. But Dr. Eriksson had a longstanding problem completing his charts in a timely fashion, which had reached a critical mass *before* he sought leave; indeed, by April 2012, he had 180 charts overdue. The delinquency had become so significant by that time that DRHC's human resources department had to become involved, which Stampohar testified was "out of the norm." (Eriksson Dep. Ex. 9; Stampohar Dep. at 62-63.) Moreover, shortly before Dr. Eriksson applied for FMLA leave, DRHC had to write off several patient visits, resulting in the loss of thousands of dollars in revenue. Under the circumstances, the so-called "escalation" in DRHC's conduct is hardly unexpected and belies a causal link. See, e.g., Burkhart v. Am. Railcar Indus., Inc., 603 F.3d 472,

477 (8th Cir. 2010) ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation.") (citation omitted). Indeed, by Dr. Eriksson's logic, an employer could not take disciplinary action against an employee after he invoked the FMLA, even in response to a performance issue that pre-dated the FMLA request. That is clearly not the law. See, e.g., Bone v. G4S Youth Servs., Inc., 686 F.3d 948, 959 (8th Cir. 2012); Hervey v. Cnty. of Koochiching, 527 F.3d 711, 726 (8th Cir. 2008) ("An employee in trouble with supervisors . . . may not insulate herself from discipline by" invoking FMLA rights.).[9]

**B. Pretext**

Under McDonnell Douglas, if an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. Wierman v. Casey's Gen. Stores, 638 F.3d 984, 999 (8th Cir. 2011). If it does so, the employee must then proffer sufficient evidence to "create a genuine issue of material fact whether [the] proffered explanation is merely a pretext for unlawful" discrimination. Id. "The ultimate question of proof – the burden of which remains on the employee throughout the inquiry – is whether the employer's conduct was motivated by" the employee's invocation of his FMLA rights. Id. Here, assuming *arguendo* Dr. Eriksson has stated a prima facie case under the FMLA, he has failed to create a genuine issue

[9] In his deposition, Dr. Eriksson offered an additional fact allegedly showing a causal connection: three DRHC employees also were behind on their charting but were not disciplined. (Eriksson Dep. at 96.) But he abandoned this contention in his brief, likely because, as DRHC notes, no evidence suggests any of the three was similarly situated to Dr. Eriksson. (See Def. Mem. at 16-17 (quoting Allen Health, 302 F.3d at 835 ("It is the employee's burden to prove that the compared employees were similarly situated in all relevant respects.")).)

whether DRHC's proffered reason for his termination – he was not a "good fit," based on his ongoing performance issues – is pretextual.

Dr. Eriksson argues he has created a jury question on pretext because he received a dearth of negative written feedback prior to requesting FMLA leave. He asserts the only "papers" documenting performance issues prior to June 7, 2012, are the handwritten notes from the April 2012 meeting with Stampohar and Buescher, at which DRHC's concerns about communication and scheduling were discussed. (Mem. in Opp'n at 23.) And he claims that DRHC's efforts to "paper his file" after he sought FMLA leave show that its proffered reason for his termination is pretextual. (Id.)

But Dr. Eriksson simply has the facts wrong. Besides the notes of the April 2012 meeting, other documents in the record show DRHC was concerned with his performance before he invoked the FMLA. (See Eriksson Dep. Exs. 9 (4/19/12 e-mail regarding 180 unsigned charts), 12 (5/22/12 e-mail regarding intubation problems), 13-14 (5/23/12 e-mails regarding the same).) Moreover, Dr. Eriksson *acknowledged* in his deposition that he had received repeated counseling regarding his delinquent charting and for communication/scheduling problems. Notably, he offers no evidence that DRHC violated its own internal policies or deviated from a policy of progressive discipline when it "papered his file" and then terminated his employment; indeed, he offers no evidence of DRHC policies whatsoever. Cf. Erickson v. Farmland Indus., Inc., 271 F.3d 718, 727 (8th Cir. 2001) (employee can prove pretext with evidence the employer varied from its normal policy or practice).

Dr. Eriksson next argues that DRHC's proffered reason for his termination has changed over time. (Mem. in Opp'n at 23-24.) Substantial shifts in the explanation given for an employee's termination can indeed be probative of pretext. Pulczinski, 691 F.3d at 1004. But here DRHC's reasons have not substantially changed. The termination letter provided to Dr. Eriksson in August 2012 indicated that he was not a "good fit" for the organization, listing several reasons why that was the case, including the failure to grow his patient panel at the Meridian Clinic and his greater interest in working in the ER. Nothing in the letter, however, indicated those were the *only* reasons. That DRHC offered additional reasons in discovery here, as did Stampohar in his deposition – including many reasons previously communicated to Dr. Eriksson, such as scheduling concerns, charting delays, competency with intubation, and patient complaints – simply provides additional elaboration why he was not a "good fit," not a contradiction suggesting pretext. Id.; Loeb v. Best Buy Co., 537 F.3d 867, 874 (8th Cir. 2008).[10]

Finally, Dr. Eriksson challenges the accuracy of many of the matters offered by Stampohar to support his termination decision. He argues, for example, that he was working all of the shifts required by DRHC in his employment agreement and always found coverage when he was "double booked" at the Meridian Clinic and the ER. (Mem. in Opp'n at 26.) But this argument is a non-starter, as he acknowledged in his deposition he possesses no evidence to suggest Stampohar did not *believe* the reasons provided to

[10] Dr. Eriksson questions why these other issues were not included in the Performance Improvement Plan if they were significant enough to warrant termination. (Mem. in Opp'n at 24.) But DRHC has offered an unrebutted explanation: the Plan was drafted by DRHC's medical-records personnel and therefore was limited to issues regarding charting. (Buescher Dep. at 16, 54.)

support his decision. (Eriksson Dep. at 90 ("Q: [W]hile you may disagree with [the reasons given in Stampohar's August 10, 2012 letter], you recognize that you have no evidence to show that [he] did not truly believe those statements to be true; is that correct? A: I have no evidence.").) This is fatal to Dr. Eriksson's claim: the question is not whether the reasons provided by Stampohar were accurate, but rather whether he had a good-faith belief in them. See, e.g., Wierman, 638 F.3d at 995. Nothing in the record undermines that conclusion here.

## CONCLUSION

The evidence in this case simply does not create a genuine issue whether Dr. Eriksson's invocation of his FMLA rights played a part in the termination of his employment. At best, he has challenged the soundness of Stampohar's decision to discharge him, but this Court does not sit as a "super-personnel department" reviewing the wisdom of that decision. Bone, 686 F.3d at 955. "Employers are allowed to make even hasty business decisions, so long as they do not discriminate unlawfully, and there is no evidence here that [DRHC acted] because of an animus against" Dr. Eriksson for seeking FMLA leave. Pulczinski, 691 F.3d at 1005. Accordingly, his FMLA claim fails.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that DRHC's Motion for Summary Judgment (Doc. No. 20) is **GRANTED** and Dr. Eriksson's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date: April 18, 2014

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge